IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

UNITED STATES OF AMERICA

v.  CRIMINAL ACTION NO. 3:21-00099

MATTHEW CORBAN HAGY

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant Matthew Corban Hagy's Motion to Suppress. ECF No. 42. On May 3, 2022, the Court held a hearing on the motion, and it permitted the parties to file supplemental briefing following the hearing. With that briefing now complete and upon consideration of the evidence and the parties' arguments, the Court **DENIES** Defendant's motion for the following reasons.

**I.
BACKGROUND**

On December 29, 2020, Putnam County Sheriff Deputies Keegan Mullins and Brandon Pauley were dispatched to a residence in Poca, West Virginia, to investigate a report of a sexual assault. Specifically, dispatch had informed the deputies that a caller said Defendant had touched and took explicit pictures of her juvenile son. *CAD Report*, at 1 (Dec. 29, 2020), ECF No. 53-2; *Report of Action Taken by Dep. K.M. Mullins*, ECF No. 53-1. Deputy Mullins testified he was a probationary deputy at the time working with Deputy Pauley, who was a Field Training Officer. He also explained that Deputy Pauley was unavailable to testify at the hearing because of an existing family responsibility. *Mot. Hrg. Tr.*, at 4 (May 3, 2022), ECF No. 54.

Although the events at issue occurred in December 2020, Deputy Mullins admitted that he had just written a report of the incident in April 2022. *Id*. at 9, 15. He explained that he did not write the report in December 2020 because he was a probationary deputy and Detective Ryan Childers, who became involved in the case, "said he would take care of it[.]" *Id.* at 11. However, after the motion was filed, Deputy Mullins prepared the report that was introduced by the Government into evidence. *Id*. at 15.[1]

Deputy Mullins testified that, when he and Deputy Pauley arrived at the scene, Defendant was outside by himself standing by a car with Tennessee plates, "with the car door slightly open." *Id*. at 5, 16. At the time, the deputies believed the car belonged to Defendant. *Id*. at 16. However, the car actually belonged to Harry Blackford. Mr. Blackford was from Tennessee and was visiting his family at the residence. Defendant was with Mr. Blackford as his caregiver. *Id*. at 17.

Deputy Mullins testified they approached Defendant, he identified himself, and they asked if they could do a pat down. *Id*. at 6. Defendant gave consent so Deputy Pauley frisked him and removed a cell phone from his pants pocket. *Id*. at 6-7. Given that they were told Defendant took explicit pictures of a minor, Deputy Mullins testified they assumed the pictures were taken on the cell phone. *Id.* at 7. To prevent any evidence on the cell phone from being destroyed, Deputy Mullins put the cell phone in Deputy Pauley's vehicle. *Id.* According to Deputy Mullins, Defendant was not handcuffed at that time, but he was detained for investigative purposes. *Id*. at 8.

---

[1]Deputy Mullins stated he did not actually read the motion before preparing his report. *Id.* at 18-19.

Thereafter, Deputy Pauley called Detective Ryan Childers for further guidance on what to do. *Id*. at 8. Following the phone call, Deputy Pauley asked Defendant if he would be willing to give a statement at the courthouse. *Id*. at 9. Defendant agreed, and the deputies transported him to the courthouse in a cruiser. *Id.* Prior to leaving the scene, Deputy Mullins said Defendant complained of being hit, but Deputy Mullins said he neither saw the altercation nor any injuries. *Id.* at 11-13.

Detective Childers also testified at the hearing. He said that Deputy Pauley had called him from the residence, and he advised Deputy Pauley to ask Defendant if he was willing to speak with them at the courthouse. *Id*. at 22. He also told Detective Pauley to secure the phone and bring it with him because they planned on obtaining a search warrant for it. *Id*. Detective Childers said he went to the courthouse and started working on getting the warrant. He also said he met Deputy Pauley and Defendant there. Detective Childers said he read Defendant his Miranda rights, and Defendant voluntarily waived his rights and gave a statement. *Id*. at 23.[2]

In his statement, Defendant reported that he was shopping with Mr. Blackford when he got a call to come back to the house. *Statement of Matthew Hagy*, at 1, ECF No. 53-3. When they arrived at the house in Poca, an unnamed individual hit him as soon as he got out of the car and another person confronted him about finding pictures on a camera that was in the house. *Id*. at 1-2. After initially denying knowing what they were talking about, Defendant said: "'Oh, you talkin about that picture?' and I was like, 'Yeah, okay,' I said 'Yeah, I know and I should have came and told you right then and there,' . . . uh . . . but I didn't . . ." *Id*. at 1. Defendant said he also

---

[2] A signed copy of Defendant's Miranda rights was submitted as Government's Exhibit 5. ECF No. 53-5.

was asked: "Well, what about last year when you had pictures on your phone?" *Id*. at 2. To which he replied that "those were pictures I downloaded off the internet and it wasn't any of your business any way, you know, that's me for my personal use it had nothin to do with this,' and then he shut up about that." *Id*.

Following the interview, Detective Childers told Defendant he was free to leave, but they were getting a search warrant for his phone and he could stay to get the warrant paperwork if he wanted. *Tr.* at 26. Defendant decided to stay and went outside by himself to smoke a cigarette. *Id*. at 26-27. After the warrant was signed,[3] Defendant was given a copy, he signed a property receipt for his phone, and Deputy Pauley gave him a courtesy ride back to the Poca. *Id*. at 28. However, after Detective Childers spoke with the prosecutor, he called Deputy Pauley to bring Defendant back because the prosecutor told them to file charges and have him arrested. *Id*. at 29.

Following Detective Childers' testimony, Defendant took the stand on his own behalf. Defendant testified that he was driving during rush-hour traffic on Interstate 64 when he received the call requesting he bring Mr. Blackford back to Poca to visit the family. *Id*. at 32-33. He said he took the cell phone out of his right pocket, with his right hand, while he drove with his left hand. *Id*. at 41. After he hung up, he said he crossed his right hand over his body and put the phone in the pocket of the driver's side door because he did not want to struggle getting it back in his pocket while he was driving. *Id*. at 33, 41. He explained he did not put his phone on the center console because Mr. Blackford's wallet was there. *Id*. at 42.

---

[3]Detective Childers estimated it was about five hours from the time the cell phone was seized until the warrant was signed by the judge. *Id*. at 28.

When he and Mr. Blackford arrived at Poca, he said he "pulled up into the driveway, shut the car off, took the keys out of the ignition and had them in [his] hand as [he] and Mr. Blackford approached the garage." *Id*. at 34. On direct examination, Defendant said "the only thing [he] had with [him] were [his] keys" and he left his phone in the car door, which he shut. *Id*. at 37. He said several family members were outside and one person started yelling at him and another person hit him with a closed fist on the left side of his face at least two times. *Id*. at 34-35, 42-43. It is uncontested that at some point someone from the family took the keys from Defendant to prevent him from leaving.[4]

Defendant testified he did not remember whether the police were there when he was hit or after he was hit because he was "knocked . . . silly." *Id*. at 44. However, at another point, he testified that he saw "the police officers coming up the road" after he was hit. *Id.* at 34. Yet, at another point in his testimony, Defendant stated the officers arrived about five minutes after he got to the residence and, when they got there, they immediately placed him in handcuffs and placed him in the back of a squad car. *Id.* at 36, 38, 48. He initially claimed he remained handcuffed until he was questioned at the courthouse, but he later said he was handcuffed "for approximately the next 30 minutes, . . . until they placed [him] in the car." *Id*. at 36, 51. Defendant also stated his ear was bleeding, and one of the officers asked him about it. *Id*. at 35.

According to Defendant, Mr. Blackford had gone in the house when they arrived, but he came back out when he heard the commotion. *Id*. at 37. Mr. Blackford asked one of the deputies to retrieve his wallet, which he had left in the car. *Id*. at 37, 52. Defendant testified the

---

[4]The CAD sheet indicates officers were on the scene as early as 15:07:47 and the family called and told dispatch that they had the keys at 15:07:53. *CAD*, at 2.

deputy asked him if the deputy could get in the car to get the wallet. *Id*. at 37, 51-52. Defendant stated that, although the car actually belonged to Mr. Blackford, the deputy "didn't realize it wasn't my vehicle at the time, but I gave him permission to go into the vehicle and retrieve the wallet." *Id*. at 37, 51. Defendant said it was then that the officer took the phone out of the car. *Id.* at 53. Defendant adamantly denies that it was taken from his pocket. *Id*. at 37, 46-47.

On cross-examination, Defendant testified that, after they arrived, he collected his various items out of the car while Mr. Blackford went into the house. Contrary to his early statement that he only had his keys with him, he said he also got his cigarettes, lighter, fast food, and his jacket out of the car. *Id.* at 40, 46. However, he maintained he left his cell phone in the car because he did not have service at that location. *Id*. at 47. Defendant now argues that the deputies violated his Fourth Amendment rights by failing to obtain a warrant before seizing his cell phone out of the car and, therefore, any evidence found on the phone should be suppressed.[5]

According to the Government, a digital search of Defendant's cell phone revealed 833 images and three videos containing suspected child pornography, some involving prepubescent males and females engaged in sexual acts. There also were 57 videos of the victim, and several of those videos zoomed in on the victim's clothed crotch area. The Government represents that one video shows an adult hand spreading apart the victim's naked buttocks. On June 11, 2021, Defendant was indicted for Production of Child Pornography, in violation of 18 U.S.C. § 2251(a) and (e) and Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) and 2252(b)(2).

---

[5]Defendant specifically states he is not challenging a finding of probable cause for his arrest.

## II.
## DISCUSSION

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . and effects, against unreasonable search and seizures[.]" U.S. Const. amend. IV. Although the Fourth Amendment requires police officers to obtain warrants in most instances, the Fourth Amendment's touchstone is reasonableness, and the Supreme Court has articulated there are narrow situations in which the exigency of the circumstances necessitate the seizure of an item before a warrant can be obtained. *Missouri v. McNeely*, 569 U.S. 141, 148-49 (2013) (citations omitted); *United States v. Curry*, 965 F.3d 313, 321 (4th Cir. 2020), as amended (July 15, 2020), as amended (July 16, 2020). One such exigent circumstance exists "to prevent the imminent destruction of evidence." *Id*. at 149; *Kentucky v. King*, 563 U.S. 452, 460 (2011) (stating "the need to prevent the imminent destruction of evidence has long been recognized as a sufficient justification for a warrantless search" (internal quotation marks and citations omitted)). The burden to prove that such an exigent circumstance exists rests of the Government. *Curry*, 965 F.3d at 319. In evaluating whether the Government has met its burden, the Court must consider the totality of the circumstances. *United States v. Bowles,* No. 19-4910, 2022 WL 18501, at *1 (4th Cir. Jan. 3, 2022) (per curiam). However, the Government is not required to prove the imminent destruction of evidence; "rather, the proper inquiry focuses on what an objective officer could reasonably believe." *U.S. v. Grissett*, 925 F2d 776, 778 (4th Cir. 1991) (per curiam) (citation omitted).

In an analogous situation as to the one presented here, the Fourth Circuit upheld the warrantless seizure of two cell phones from a defendant in *United States v. Burton*, 756 Fed. App'x. 295 (4th Cir. 2018) (unpublished). In *Burton*, the defendant was accused of using a cell

phone to take pictures up a woman's skirt in a grocery store. 756 Fed. App'x. at 297. After being identified, the defendant voluntarily agreed to be interviewed about the incident at a police station. *Id*. The detective conducting the interview testified that he was skeptical of the defendant's version of the events and immediately seized the two cell phones the defendant had brought with him. The detective stated he believed there was "probable cause to seize the phones" and he feared the defendant "would destroy digital photos, or the phones themselves" if he did not immediately take them. *Id*. Two days later, the detective obtained a search warrant for the phones. *Id*. Although there were no images of the woman who reported the incident uncovered on the phones, multiple images up other women's skirts were found. *Id*. A subsequent search of electronic equipment at the defendant's house revealed child pornography. The defendant filed a motion to suppress the evidence, and he entered a conditional plea after the district court denied his motion. *Id*. at 298.

On appeal, the defendant argued, inter alia, that the cell phones were unlawfully seized and the district court wrongfully denied his motion to suppress. In considering whether exigent circumstances existed for a warrantless seizure of the phones, the Fourth Circuit analyzed

> whether: (1) the police had probable cause to believe that the item seized contained contraband or evidence of a crime; (2) the police had "good reason to fear" that, absent such seizure, the defendant would destroy material evidence before the officers could obtain a warrant; and (3) the police "made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy."

*Id*. at 298-99 (quoting *Illinois v. McArthur*, 531 U.S. 326, 331-33 (2001) (other citation omitted). Additionally, the Fourth Circuit recognized that a temporary warrantless seizure will be upheld if the seizure is "supported by probable cause" and it is "designed to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period of time." *Id*. at 299 (internal quotation marks and citations omitted).

Under the facts presented in *Burton*, the Fourth Circuit found the above factors were met because the defendant knew he was being investigated for taking the photos on his phone; the detective doubted the defendant's version of the events; the defendant could have easily "deleted, transferred, or otherwise removed the digital photos from the phones"; it was reasonable for the detective to believe the defendant may destroy the photos or cell phones; and the detective "made sufficiently 'reasonable efforts' to balance law-enforcement needs with [the defendant's] Fourth Amendment rights." *Id*. (quoting *McArthur*, 531 U.S. at 332). The Fourth Circuit also recognized that the defendant voluntarily agreed to be interviewed, he was not immediately arrested, and the phones were not seized until after the interview when the detective because skeptical of his explanation of what happened. *Id*. Therefore, the Fourth Circuit determined that the initial seizure of the cell phones was justified under the exigent circumstances exception. *Id*. at 300.

In this case, the Government and Defendant present two different scenarios of what occurred. In the Government's version, Deputy Pauley patted Defendant down for officer safety and discovered the cell phone in Defendant's pocket. Although a family member actually found the explicit pictures of the victim on a camera that was in the house, the deputies responding to the scene did not know that fact when they arrived. Instead, Deputy Mullins testified that he believed the photos were on the defendant's cell phone. As it is routine for people to snap and store pictures on their cell phones, the Court finds that an objective officer under the circumstances reasonably could believe, as Deputy Mullins did, that the alleged photos of the victim were on Defendant's cell phone. Additionally, as in *Burton,* this Court has no difficulty finding it was reasonable for the officers to believe that it was necessary to seize the cell phone before getting a warrant to preserve

the evidence by preventing Defendant from destroying the phone or easily deleting, transferring, or otherwise removing any photos from its memory. Moreover, the Court finds the officers reasonably balanced the need to preserve the suspected evidence with Defendant's Fourth Amendment rights. Defendant voluntarily agreed to give a statement, and the officers merely seized the cell phone and very quickly thereafter obtained a warrant to search its contents. Thus, given the totality of the circumstances, the Court easily finds the Government has demonstrated that the seizure of Defendant's cell phone was justified under the exigent circumstances exception.

Under the second scenario, Defendant claims that he left his cell phone in the car door, and he argues the Fourth Amendment required the officers to obtain a warrant before removing it. Although the Court finds Deputy Mullins' version of events much more credible than the inconsistent testimony of Defendant, the Court does find Defendant raises two legitimate concerns with respect to the Government's evidence. First, the Court agrees with Defendant that it is troublesome that Deputy Mullins, who was in training when the event occurred, wrote a report in response to Defendant's motion some fourteen months after the event. Second, the Court questions Defendant Mullins' recollection that Defendant was outside by himself when the deputies arrived. It is undisputed that the family took the keys away from Defendant to keep him there until officers arrived, and it seems illogical that under the circumstances they would leave him outside by himself to potentially walk away. Nevertheless, the Court finds that neither of these two concerns make the critical aspects of Defendant's testimony more credible than that of Deputy Mullins.

During his testimony, Defendant initially testified that he only took the keys with him when he got out of the car. Later, he said he also gathered his cigarettes, lighter, jacket, and

fast food, but he left his cell phone there because he did not have service. Given this inconsistency, and the other inconsistencies in his testimony highlighted above, the Court finds Defendant's testimony was not credible. The Court believes it is unlikely that Defendant would have grabbed his cigarettes, lighter, jacket, and fast food without also picking up his cell phone. Even if Defendant did not have cell phone service at that location as he claims, his cell phone obviously was used for multiple purposes, including storing photos and videos. Having listened to the testimony and observing Defendant's demeanor, the Court simply does not believe his claim that he left the cell phone in the car.

Nevertheless, even if the Court were to accept Defendant's claim, the Court find the cell phone still was lawfully seized. Defendant did not own the car, he was not in the car when the deputies arrived, and he failed to demonstrate that he had any reasonable expectation of privacy in the car. Moreover, Mr. Blackford, who owned the car, asked the deputy to enter the car to get his wallet, and Defendant, whom the deputy thought at the time owned the car, also consented to the deputy retrieving Mr. Blackford's wallet from the car. Thus, there was no Fourth Amendment violation when Deputy Pauley got in the car. Additionally, there was no testimony or allegations that the deputies conducted a full search of the car or did anything other than retrieve the wallet and the cell phone that was in plain view. *See King*, 563 U.S. at 462–63 (stating "law enforcement officers may seize evidence in plain view, provided that they have not violated the Fourth Amendment in arriving at the spot from which the observation of the evidence is made" (citation omitted)). As the Fourth Circuit recently explained in *United States v. Smith*, 21 F.4th 122 (4th Cir. 2021), "[w]hen someone leaves personal belongings behind in another's car, he assumes the risk that the car's owner will consent to a search of the car or that the car's contents will come into plain

view of the police." 21 F.4th at 130. Thus, even if the Court assumes Defendant left his cell phone in the car, there was no Fourth Amendment violation when the deputy seized it based upon his reasonable belief it contained evidence of a crime and exigent circumstances existed that necessitated preservation of the evidence.

## III.
## CONCLUSION

Accordingly, regardless of whether the cell phone was found in Defendant's pocket, as the Court concludes, or if it was found in the car door, as Defendant contends, the Court finds exigent circumstances existed to seize the phone prior to obtaining a warrant. Therefore, the Court finds the seizure under either scenario did not violate Defendant's Fourth Amendment rights given the totality of the circumstances, and the Court **DENIES** his Motion to Suppress.

The Court **DIRECTS** the Clerk to send a copy of this Order to the defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER: May 18, 2022

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE